1  Name: DAMON EVENS
   Address: 2375 E. CAMELBACK RD 6TH FL.
2  City, State, ZIP: PHOENIX, AZ 85016
   Daytime Telephone No: 480-212-2928
3  Representing Self, Without a Lawyer

4  GLORIA VILLA AZCLDP #81345
   AZ STATEWIDE PARALEGAL #80890
5  (602) 253-1515
   2942 N. 24th St. Suite 204
6  Phoenix, AZ 85016

FILED ✓   LODGED
RECEIVED   COPY

APR 2 7 2012

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY _____ M DEPUTY

7              **In the United States District Court**
              **for the District of Arizona**
8

9  ROMELL CALDWELL                    Case No. 2:12-CV-00578-MEA
                  Plaintiff,
   and                                **DEFENDANT'S**
10                                     **RESPONSE TO COMPLAINT**

11 101 DISTRIBUTION, LLC
                  Defendant.
12

13     COMES NOW Defendant, DAMON EVANS DBA 101 DISTRIBUTION, LLC, for his
   Response to Plaintiff's Complaint, and admits, denies and alleges as follows:
14
                    **JURISDICTION AND VENUE**
15     1) ADMITS Paragraph 1 and ADMITS paragraph 2 in part but DENIES that Defendant has
   infringed Plaintiff's copyright;
16
17     2) DENIES Paragraph 3 and requests that the complaint be dismissed;

                         **PARTIES**
18
19     3) Defendant repeats and incorporates each admission and denial set forth in paragraphs 1 and 2
   as if fully set forth herein;
20
       4) ADMITS Paragraph 5,6;
21
                       **BACKGROUND**
       5) Defendant repeats and incorporates each admission and denial set forth in paragraph 1-4 as if
22 fully set forth herein

23     6) Defendant does not have enough information to ADMIT or DENY, paragraph 8, 9, 10, 11;

24     7) DENIES paragraph 12 and 13;

25             **COUNT 1- COPYRIGHT INFRINGEMENT**

26     8) Defendant repeats and incorporates each admission and denial set forth in paragraph 1-7 as if
   fully set forth herein;

9) DENIES paragraphs 15-18;

10) On December 9, 2009, 101 Distribution contracted with copyright label owner Lonnie Love of UDIGG records to sell, promote and distribute the content in question. UDIGG Music Group Inc and Orlean W. Plummer p/k/a Bigga Rankin, claimed full ownership of the content in question as evidenced by his signature on the Deal Memo for Master Purchase paragraph H of Exhibit A, attached hereto and incorporated herein by reference. UDIGG Music Group agreed in this document to indemnify, 101 Distribution in full for any possible third party claims to the contrary. 101 Distribution paid cash for the rights to distribute and does not know Plaintiff. Defendant requests that the case be dismissed and that Plaintiff work directly with UDIGG to resolve the issue between the parties. Exhibits A, B, C and D are attached hereto and incorporated herein by reference.

WHEREFORE, having fully defended, Defendants pray as follows:

A.     That Plaintiff's Complaint be dismissed;

B.     That Plaintiff be ordered to pay their own fees/costs, including attorney fees;

C.      For such further and additional relief as the Court may deem appropriate.

STATE OF ARIZONA           )
                           )ss.
County of Maricopa         )

**101 DISTRIBUTION by and through DAMON EVANS, MEMBER**, have read the foregoing **RESPONSE TO COMPLAINT** and affirm and attest that the facts stated above are true and correct to the best of my knowledge and belief.

_____
101 DISTRIBUTION by and through
DAMON EVANS, MEMBER, Defendant

SUBSCRIBED AND SWORN TO before me this _26_ day of _April_, 20_12_ 101 DISTRIBUTION by and through DAMON EVANS, MEMBER.

_Gloria Villa_____
Notary Public

My Commission Expires:

A copy of the foregoing mailed
this _26_ day of _April_, 2012 to:

MICHELLE D. JOHNSON Attorney for Plaintiff
The Law Office of Michelle Johnson, PLLC
1421 E. THOMAS ROAD
PHOENIX, AZ 85014

DANIAL A. NELSON
KEVIN P. MCCULLOCH
NELSON & MCCULLOCK LLP
The Chrysler Building
405 Lexington Ave, 26th Floor
New York, New York 10174

GLORIA VILLA
Notary Public - Arizona
Pima County
My Comm. Expires Dec 16, 2014

EXHIBIT "A"

**DEAL MEMO FOR MASTER PURCHASE**

Udigg Music Group Inc.                              Orlean W. Plummer
2195 Defoor Hills Rd Suite J                        p/k/a Bigga Rankin
Atlanta, GA 30318

A).    It is agreed that Udigg Music Group Inc. has purchased the exclusive rights to sell product to all retail and digital accounts worldwide.

       Udigg Music Group Inc. distributes, manufactures and sells musical recordings on CD and digital distribution and desires to sell the following project listed under letter B.

B).    Udigg Music Group Inc. shall invest a total of $6,000 for the following project:

       1). Plies (Goons)

       Investments shall happen via these terms:

C).    Investor indemnifies and holds Udigg Music Group Inc. harmless against future claims, damages and attorney's fees in the event any claims are made against Udigg Music Group Inc..

D).    Investor represents and warrants that the titles are free, clear and unencumbered, have no outstanding claims, and that master recordings were made as work for hire.

E).    Accounting Statements:  Udigg Music Group Inc. agrees to pay Orlean W. Plummer p/k/a Bigga Rankin a $6,000 one-time fee.

F).    Indemnification:  Orlean W. Plummer p/k/a Bigga Rankin agrees to indemnify and hold Udigg Music Group Inc. and Udigg's successors, assigns, agents, distributors, licenses, officers, directors and employees harmless against any claim, liability, cost and expenses (including reasonable attorney's fees and legal costs in connection with any claim which is inconsistent with any agreement).

G).    Logo:  Udigg Music Group Inc. will include Orlean W. Plummer p/k/a Bigga Rankin's, logo as an imprint on all releases hereunder and all advertising.  Udigg Music Group Inc. will provide the manufacturing and UPC code.

H).    Company represents and warrants that:
       1). It is the exclusive owner of the album, and all rights embodied therein including the right and authority to enter into and fully perform this agreement;
       2). It has obtained all permissions, waivers and releases from all authors, performers, producers, musicians and all other contributors to the musical recordings contained in the albums which are or may be necessary for the performance of this agreement and it shall be solely responsible for the

payment of any sums in respect thereto;

     3).The musical, artistic and literary materials, ideas and other intellectual properties, embodied in the albums do not violate or infringe upon and copyright or right of privacy of any person or corporation.

I).    Represents that no future royalty payments of any kind are due to the investor.

J).    This agreement has been entered into the state of Florida and the validity, interpretation and legal effect of this agreement shall be governed by the laws of said state applicable to contracts entered into and performed entirely within said state. Neither party may assign or otherwise transfer this agreement or any of the rights or obligations hereunder to any person, firm or corporation. Where there is conflict between the provisions of this agreement and any present or future statue, law, ordinance or regulations, the later shall prevail but in such event, the provisions of this agreement affected shall be deemed amended to the extent necessary to bring it within the requirements of said law or regulation and excerpt with respect to said amendment this agreement shall remain in full force and effect. This agreement sets forth the entire understanding between the parties hereto and replaces and supersedes all other agreements relating to the subject matter hereof. This agreement cannot be modified, altered, terminated or otherwise changed except by an instrument in writing signed by all parties hereto. In the event either party initiates litigation to enforce this agreement, the prevailing party shall be entitled to recover reasonable attorney's fees and costs incurred in connection with such litigation. This agreement shall be binding upon and inure to the benefit of the successors, assigns, heirs and personal representatives of the parties hereto. Nothing contained herein shall create a joint venture or partnership between the parties hereto. The paragraph headings herein are inserted only as a matter of convenience and in no way define, limit or describe the scope or intent of this agreement. Any of the notices require or permitted hereunder shall be in writing and shall be considered duly given and received upon deposit in the United States Mail, certified or registered, to postage, prepaid, return receipt requested, addressed to the address of each party as first set forth above. Any change of address shall be communicated to the other party by way of notice.

It is understood that all of the above listed terms make up this agreement.

Accepted on July 7, 2009

_____       _____

Udigg Music Group Inc.        Orlean W. Plummer p/k/a/Bigga Rankin

# Wire Transfer Services
# Outgoing Wire Transfer Request


**WELLS FARGO**

A customer or team member, with the customer present, completes this form when requesting to send a wire. Outgoing wires can only be sent for Wells Fargo customers. Retain the original copy in the bank and provide a copy to the customer ensuring you give the customer the Agreement for Outgoing Wire Transfer Request (page 2 when form is accessed on-line & preprinted on the back of printed forms). Required information is noted with an asterisk. Note: Wells Fargo Wire Transfer Services will route wires based on correspondent banking relationships. See back (page 2) for explanations of the Mexican CLABE account, the SWIFT BIC, the International Routing Code (IRC) and the International Bank Account Number (IBAN).

| *Today's Date | *Send Date (if next day submit wire after 4:30 CT. Store must hold it other than today or next day date.) |
|---|---|
| December 9 2009 | December 9 2009 |

## 1. Originator's Information

| *Customer's Name | | *Phone Number |
|---|---|---|
| 101 Distribution LLC | | 602 212 2928 |

*Customer's Address, City, State, Zip Code

2375 E Camelback Rd   Fl 5   Phoenix Az 85016

| *Transfer from Wells Fargo Bank Account No. (Must be checking, savings, market rate or wholesale checking account) | *U.S. Dollar Wire Amount |
|---|---|
| 457816138 | 9500.00 |

International Wire only: When sending in foreign currency, please ensure the beneficiary's account accepts the designated currency.

| Funds to be sent in foreign currency | Foreign Currency Type/Name (SVT/SVP will default to FX unless specified otherwise.) | *Currency Code (if known) | *Foreign Currency Amount |
|---|---|---|---|
| ☐ Yes   ☐ No | | | |

## 2. Beneficiary/Recipient Information (This is the ultimate recipient of the wire transfer funds.)

*Beneficiary/Recipient Name

Udiag Investment Group

*Beneficiary Account Number, Mexican CLABE # or the International Bank Account Number (IBAN) where applicable:

003272938954

Beneficiary Address, City, State, Zip Code (A physical address is required.)

| Information for the Beneficiary (invoice number, Purchase order number, etc.) | Beneficiary Phone Number |
|---|---|
| ref 101 Distribution | |

## 3. Beneficiary Bank Information (This is the financial institution where the beneficiary maintains their account.)

| *Beneficiary RTN or SWIFT Bank Identifier Code (SWIFT BIC) | *International Routing Code (IRC) |
|---|---|
| 026009593 | |

*Beneficiary Bank Name

Bank of America

Beneficiary Bank Address, City, State, Zip, Country (optional information)

Information for Beneficiary Bank (wires to Mexican banks require the CLABE account number in the Beneficiary instructions to ensure correct payment.)

## 4. Intermediary Bank Information (This is a financial institution that the wire must pass through before reaching the final beneficiary bank.) This section is optional and not required for all wires. Please note that routing may be altered depending on Wells Fargo Bank's correspondent relationships.

| Optional: *Intermediary Beneficiary Bank RTN or SWIFT BIC | International Routing Code (IRC) |
|---|---|
| | |

| *Intermediary Bank Name | *Intermediary Bank Account No. |
|---|---|
| | |

Intermediary Bank Address City, State, Zip, Country (optional information)

Information for Intermediary Bank

## 5. Wire Fee & Customer Signature (Additional fees from intermediary and beneficiary banks may be charged to international transactions – see Fees Section on page 2 of this form.)

| Wire Fee Amount (the Transfer From account will be charged the fee.) The region that houses the account being debited determines the fee amount. Use the fee information available through Teamworks and/or the Banker's Guide. Do not use SVT/SVP for fee when account is not in your region. Additional fees may apply (see page 2 of this form.) | *AU where the Originator's account is located | *Fee Amount |
|---|---|---|
| | 1513 az 038 | $20.00 |

My signature here indicates agreement to all of the information on this Outgoing Wire Transfer Request and to the terms and conditions on the second page of this request. Wells Fargo Bank is authorized to rely on this information on this Request in making the requested funds transfer.

| *X | *Date |
|---|---|
| | x 12-9-09 |

## 6. Bank Use Only – Bank Approval – Following MUST be completed for All outgoing wires

| International Wire Foreign Currency Information Rate | Contract # (required when $15,000 or more U.S. $) | FX Trader Contact |
|---|---|---|

| *Wire Transaction/FAS Number | *Name on ID used by customer | Method used to verify business acct. transaction authority |
|---|---|---|
| V FW6040-7430841391 | Damon L Evans | svt and svp |

| *1st ID type, issued by State/Country & Expiration Date | *2nd ID type, issued by State/Country & Expiration Date |
|---|---|
| az dl d00812718 exp 10/13/2038 | token |

| *Initiated by and AU # | *First Approval | Second Approval, if applicable |
|---|---|---|
| X CM 6040 10:45 | X | X |

## 7. Wires in Process (WIP)

*When Customer's account is not debited, the WIP Account is funded by

☐ Paid by Check   ☐ Paid Cash   ☐ Paid through account other than checking, savings, MRA, TRS or Hogan. Reference Acct #:

| Tax ID Type – Type & No. are required when customer's account is not debited. | Tax ID No. (If non-citizen provide Alien ID #, Passport  # & Country) |
|---|---|
| ☐ Social Security   ☐ TIN   ☐ Non-U.S. Citizen without TIN   ☐ Employer ID | |

## 8. Customer Not Present

Verification of Originator (Telephone, Fax, or written requests)

| Reason caller cannot come into the Bank | Caller's location | Caller's immediate phone number |
|---|---|---|
| | ☐ Company ☐ Home ☐ Other: | |

Confirmation of Request (Banker calls customer for confirmation)

| Phone # to call to verify request | Time of call to customer | Source used: | | Token verified? |
|---|---|---|---|---|
| | | ☐ Bank Records ☐ Telephone Directory ☐ Other: | | ☐ Yes ☐ No |

| Name of person placing call | Customer Contact Name | Customer | |
|---|---|---|---|
| | | ☐ Approved the transfer  ☐ Denied the transfer | |

Telephone, Fax or Written Request Approvals

| Approver's Printed Name | Approver's Signature | Date |
|---|---|---|
| | X | |

Retain original copy in Bank and provide a copy to the customer, including both pages 1 and 2.

WTR6603 (9-09 123399FX)                                                                              Page 1 of 2

EXHIBIT "B"

<u>NON EXCLUSIVE COVER AGREEMENT</u>

| | | |
|---|---|---|
| 1. | EFFECTIVE DATE: | December 9, 2009 |
| 2. | PARTIES & CONTACT INFO: | Attention: Artist Relations<br>101 Distribution, LLC ("**101**")<br>2375 East Camelback Road, 5th Floor<br>Phoenix, AZ 85016<br><br>and<br><br>Legal Name:<br><br>Lonnie Love c/o Udigg Music Group, Inc.  ("**Owner**")<br><br>Address:<br><br>2195 Defoor Hills Rd Suite J<br>Atlanta, GA 30318<br><br>Telephone Number: 954.665.6146<br><br>Email: |
| 3. | 101 PLANS | Exhibit B attached hereto describes the "Basic Setup" and the "Professional Setup" currently being offered by 101. Please make sure that the appropriate box has been checked below for the Plan you are activating.<br><br>□ BASIC SETUP<br><br>X PROFESSIONAL SETUP |
| 4. | FEATURED RECORD | Owner must (a) insert the name of the Featured Record (I.e., the Album, EP or DVD, as applicable) on the line below, (b) must place a check mark in the appropriate box below, and (c) accurately complete Exhibit C:<br><br>Featured Record: Catalog<br><br>Album: **X** or EP: □, or Single: □, or DVD: □ |
| 5. | FEATURED ARTIST | Owner must insert on Exhibit D the name or names of the person or persons who will be designated as the "Featured Artist" on the Featured Record. (For example, in the case of "'[TITLE OF THE RECORDING]' by John Smith," John Smith is the Featured Artist, in the case of "'[TITLE OF THE |

EXHIBIT A

**NON EXCLUSIVE COVER AGREEMENT**

|   |   |   |
|---|---|---|
|   |   | RECORDING]' by [NAME OF MUSICAL GROUP]," the musical group is the Featured Artist, and in the case of "'[TITLE OF THE RECORDING]' by John Smith featuring Mary Jane," John Smith and Mary Jane are the Featured Artists. If the Featured Record is a compilation record (i.e., it contains Masters or Videos by different Featured Artists), Owner must identify each Featured Artist and the applicable Master or Video on Exhibit C.<br><br>Also, Owner must include on Exhibit D (and Exhibit C if there different Featured Artists) any professional names (also known as "stage names" and aliases) used by the person or persons comprising the Featured Artist. |
| 6. | MERCHANDISE | Exhibit E explains the terms of this Agreement specifically related to the mail order sale of Merchandise from Owner's Page. If Owner is activating the Basic Plan and desires to sell Merchandise on the Owner's Page, the Set-Up Fee for the setup and sale of Merchandise is $189.99. However, if Owner is purchasing the Pro Plan, the Set-Up Fee is $95.00. If Owner is not purchasing the Pro Plan, but would like to have 101 sell Merchandise from Owner's Page, Owner must check the box below and pay the Set-Up Fee.<br><br>□ **MERCHANDISE** |

This Non-Exclusive Distribution Agreement, between 101 and Owner, is being entered into in light of the following:

A.    101 operates an Internet website, with the URL www.101distribution.com and www.101d.com (the "Site"), which under the Plans may provide for the (i) digital distribution of recordings and video, (ii) the distribution of merchandise related to recording artists, (iii) retail and mail order distribution of pre recorded compact discs and DVDs, (iv) the online marketing and promotion of recordings, video, records and merchandise, and (v) the distribution of mobile content, such as ringtones derived from Masters and digital wallpaper and screensavers. (The Site and the services offered by 101, whether existing as of the date of this Agreement or as may be existing thereafter, are collectively referred to as the "Service.")

B.    Owner is desirous of participating in the Service being offered by 101.

The foregoing terms and the terms of the exhibits listed below and attached hereto (collectively, "This Agreement"), constitute a legally binding agreement between 101 and Owner, which is being entered into in consideration of the promises and mutual benefits contained in this Agreement. Owner's use of the Service or any aspect thereof is based on Owner's acceptance, without modification, of this Agreement. Before Owner may use the Service and have Products sold by 101, Owner must read and accept all of the terms and conditions in, and linked to, this Agreement and the 101 Privacy Policy. 101 strongly recommends that, as Owner reads this Agreement, Owner also accesses and reads the linked exhibits and documents, including the Privacy Policy.

**EXHIBIT A**

**NON EXCLUSIVE COVER AGREEMENT**

C.   Your Per Unit Payment Breakdown in US Dollars.

| Product | Avg. Payout | % of Net | Payment Cycle |
|---|---|---|---|
| 3rd Party Single MP3 | $0.53 | 75% | Every 30 Days |
| 3rd Party Full Album MP3 | $5.25 | 75% | Every 30 Days |
| Ring Tones | $0.75 | 75% | Every 120 Days |
| 101 Direct Single Song MP3 | $0.75 | 75% | Daily |
| 101 Direct Full Album MP3 | $7.50 | 75% | Daily |
| Mail Order/ Online | $7.50 | 75% | Daily |
| US Retail | $5.25 | 75% | Every 30-60 Days |
| International Retail | $4.50 | 75% | Every 60-90 Days |

Exhibit A: Non-Exclusive Cover Agreement
Exhibit B: Description of Plans
Exhibit C: Featured Record
Exhibit D: Featured Artists
Exhibit E: Definitions
Exhibit F: Terms Specific to the Sale of Merchandise
Exhibit G: Terms Specific to Digital Record Sales
Exhibit H: Terms Specific to Mail Order and Retail Sales
Exhibit I: Terms Specific to Mobile Content
Exhibit J: General Terms And Conditions

By signing below, Owner has agreed and accepted the terms, conditions and obligations of this Agreement, and acknowledges as such, the same to be applied to all recordings or films registered to Owner's account now or on a future date during the term of this Agreement. The individual or entity whose name is shown below must have the authority to enter into this Agreement for the use of Services described herein.

101 Distribution, LLC

By: _____

Damon Evans, CEO

"Owner" _udigg Music Group Inc._

_Lonnie Love_

Print Name:

Taxpayer EIN #:

Owner Legal Name:
IP Address:
Digital Signature:
Owner Credit Card Auth:

**END OF EXHIBIT A**

EXHIBIT C

FEATURED RECORD

| Title of Featured Record: PLIES: The Lost Sessions | |
|---|---|
| SELECTIONS | Insert in this column the name of the Featured Artist corresponding to a particular Selection if the Featured Artist is not listed on Exhibit D. |
| 1.  Bigga Intro | |
| 2.  100% Real Nigga | |
| 3.  Chopper Zone | |
| 4.  U Ain't A Real Nigga | |
| 5.  Where He At | |
| 6.  No Som | |
| 7.  Bid Long | |
| 8.  Plies Speaks | |
| 9.  Don't Work Don't Eat | |
| 10.  Still In 'Em | |
| 11.  God I'm Tired Of Lying To You | |
| 12.  50 Grand Short | |
| 13.  Dope Boy | |
| 14.  Pretty Pussy | |
| 15.  Bond Money | |
| 16.  Take Off | |

END OF EXHIBIT C

## EXHIBIT D

## FEATURED ARTISTS

Print Name: Algernod Lanier Washington

Professionally Known As: PLIES

Print Name: _____

Professionally Known As:

Print Name: _____

Professionally Known As:

Print Name: _____

Professionally Known As:

Print Name: _____

Professionally Known As:

Print Name: _____

Professionally Known As:

Print Name: _____

Professionally Known As:

Print Name: _____

Professionally Known As:

Print Name: _____

Professionally Known As:

Print Name: _____

Professionally Known As:

Print Name: _____

Professionally Known As:

Print Name: _____

Professionally Known As:

Print Name: _____

Professionally Known As:

Print Name: _____

Professionally Known As:

Print Name: _____

Professionally Known As:

Print Name: _____

Professionally Known As:

Print Name: _____

Professionally Known As:

## EXHIBIT E

## DEFINITIONS

Definitions: In addition to the definitions contained in the Cover Agreement and in the other Exhibits, the following capitalized words and phrases have the following meanings when used in this Agreement:

1. **"101 Entity"** has the meaning set forth in paragraph 16(a) of Exhibit J.

2. **"101 Parties"** has the meaning set forth in paragraph 13 of Exhibit J.

3. **"Accounts"** shall mean the Digital Licensees and 101's customers in the Retail Distribution of Physical Records.

4. **"Administrative Page"** means one or more web pages on the Site that Owner may only access through Owner's login name and password.

5. **"Album"** means a Physical Record or Digital Record containing more than six (6) Masters.

6. **"Artist"** means the recording artist or artists whose performances are contained on the Masters [including the Featured Artist(s)], including in the case of a Master recorded by (or a Video featuring) a musical group, each member of the group.

7. **"Artist Identification"** means the following, whether used as of the Effective Date or at any later time during the Term: any and all of the legal and professional names of the Artist (including in the case of a musical group, the name of the group), Artist's logos and designs, photographs and other likenesses of the Artist, Artist's autograph(s), Artist's voice and biographical materials relating to Artist.

8. **"Artwork"** means all artwork (whether in the form of photographs, illustrations, drawings, designs, so-called clip art or otherwise) contained in the Owner's Content.

9. **"Charges"** has the meaning set forth in paragraph 2(a) of Exhibit J.

10. **"Claim"** means a claim, action, proceeding, suit or demand made by an Income Participant or any other third party related to any of Owner's Content and/or any claim by a third party, which if true, would constitute a breach by Owner of any of the Terms.

11. **"Clearance"** means a written license, release or other type of authorization to use or incorporate in the Owner's Content any intellectual property owned or controlled by anyone other than Owner, for example, a copyrighted work (for example, Sampled Material), trademark, service mark, logo, name, likeness, autograph, biographical material or other intellectual property. Examples of such Clearances include Mechanical Licenses and Synchronization Licenses.

12. **"Collateral"** has the meaning set forth in paragraph 10 of Exhibit E.

13. **"Compositions"** means the selections contained on the Masters, including spoken words as well as musical compositions.

14. **"Controlled Compositions"** means the Compositions, or portions thereof, the copyright of which is exclusively owned throughout the universe by Owner.

15. **"Copyright Management Information"** means the digital information conveying information regarding a digital Master or Video, including the name of the author, copyright owner and performer of the digital Master or Video, the title of the applicable digital Master or Video, the name of the Composition and the Owner's name, which information shall be subject to the protection of Title 17, Section 1202 of the United States Copyright Law.

<u>EXHIBIT E</u>

<u>DEFINITIONS</u>

16. **"Cover Agreement"** means the portion of the Non-Exclusive Distribution Agreement at the front of this document where Owner has inserted Owner related information and to which all the Exhibits are attached.

17. **"Digital Record Distribution"** means direct to consumer sales of the Digital Records by 101 or a Digital Licensee in a digital format (e.g., .WAV, .MOV and .MP3 files) via digital downloading or secure streaming.

18. **"Digital Licensee"** means any third party licensed by 101 to engage in Digital Record Distribution, such as Apple iTunes, Tower.com, Netflix, Amazon, Rhapsody, Napster and more.

19. **"Digital Record"** means Masters, Albums, EPs and DVDs solely containing Owner's Content that are distributed by digital distribution to a consumer (i.e., online downloads made available by 101 or by a Digital Licensee to consumers).

20. **"Digital Royalty"** has the meaning set forth in paragraph 3 of Exhibit G.

21. **"Discounts"** mean rebates, adjustments, settlements, allowances, credits, and other types of discounts.

22. **"Distribution Fee"** means the following, as applicable per the Basic Setup Option:

(a) 25% of the Net Receipts attributable to Digital Record Distribution by Digital Licensees;

(b) 25% of the Gross Receipts attributable to Digital Record Distribution by 101 directly to Site Customers;

(c) 25% of Net Mobile Receipts attributable to the Mobile Distribution by 101 directly to Site Customers;

(d) 25% of the Net Receipts attributable to Mail Order Distribution; and

(e) 25% of the Gross Receipts attributable to Retail Distribution based on the pricing set forth in Exhibit L.

23. **"Distribution Services"** has the meaning set forth in paragraph A of page in the Cover Agreement.

24. **"Effective Date"** means the date inserted in paragraph 1 of the Cover Agreement.

25. **"EP"** means a Physical Record or Digital Record containing between four (4) and six (6) Masters.

26. **"Exhibit"** means an exhibit attached to the Cover Agreement (for example, this Exhibit E).

27. **"Featured Artist"** means the recording artist or actor or artists and actors whose performances are featured on the Masters, including in the case of a Master recorded by a musical group, each member of the group and the group itself.

28. **"Featured Masters"** mean the Masters identified in paragraph 4 of the Cover Agreement.

29. **"Featured Record"** has the meaning set forth in Exhibit C.

<u>EXHIBIT E</u>

<u>DEFINITIONS</u>

30.  "**Featured Videos**" mean the Videos identified in paragraph 4 of the Cover Agreement.

31.  "**Fee**" means monies charged by 101 to Owner to use the Service.

32.  "**Finished Goods**" means copies of the Physical Records in "retail ready" form, i.e., bar-coded and shrink-wrapped.

33.  "**Footage**" means music videos and other recorded motion pictures (including the audio portion thereof for audiovisual footage), Uploaded by Owner to the Site and/or contained in the Physical Records.

34.  "**Force Majeure Event**" has the meaning set forth in paragraph 21 of Exhibit J.

35.  "**Gross Receipts**" means monies paid or credited to 101 from the Net Sales of Digital Records, Physical Records and Merchandise net of all Discounts and taxes included in the price, and excluding all shipping and handling charges.

36.  "**Impression**" means a projection of certain content on the Site as viewed by a user or visitor to the Site.

37.  "**Income Participant**" means a person or entity who is entitled to a royalty or other payment with respect to the exploitation or other use of any of the Owner's Content (for example, the Artist, the producer of a Master, a music publisher, a union or guild, or a photographer, designer or licensor of Artwork).

38.  "**Initial Shipment**" has the meaning set forth in paragraph 2 of Exhibit B.

39.  "**Licensees**" means licensee of 101 (for example, the Digital Licensees).

40.  "**Mail Order Distribution**" means direct to consumer sales by 101 of Physical Records.

41.  "**Mail Order Royalty**" means the royalty payable to Owner for Mail Order Distribution as set forth in paragraph 1(b) of Exhibit H.

42.  "**Masters**" means sound recordings Uploaded by Owner to the Site and/or contained on a Physical Record.

43.  "**Mechanical License**" means a license to reproduce and distribute a Composition contained on a Master or on a Ringtone.

44.  "**Merchandise**" means all merchandise containing any Artist Identification (other than the Physical Records), which 101 agrees to distribute pursuant to Exhibit F.

45.  "**Merchandise Royalty**" means the royalty payable to Owner for direct to consumer sales by 101 of Merchandise as set forth in Exhibit F.

46.  "**Mobile Content**" shall mean Ringtones and digital "wallpaper" derived from photographs or other images Uploaded by Owner.

47.  "**Mobile Distribution**" shall mean the sale of the Mobile Content by 101 to a Site Customer, provided that the actual sale will be processed through the Site Customer's mobile carrier.

48.  ."**Mobile Fan Club**" shall mean the forum setup by 101 as the Owner's means of promoting information, events and giveaways to Site Customers.

EXHIBIT E

DEFINITIONS

49.  "**Mobile Royalty**" has the meaning set forth in paragraph 3 of Exhibit I.

50.  "**Net Mobile Receipts**" shall mean monies actually paid or credited to 101 by the mobile carrier of the Site Customer who purchases the Mobile Content, net of all Discounts and taxes included in the price.

51.  "**Net Receipts**" means gross shipments of the Product net of actual Fees, Returns and Reserves.

52.  "**Non-Controlled Compositions**" means all Compositions that are not Controlled Compositions.

53.  "**Physical Record Royalty**" has the meaning set forth in paragraph 1(b) of Exhibit H.

54.  "**One Sheet**" is a single page fact sheet showing the Artist, Title, Tracklist, Product Description, Cost, Item Code and buyer contact information for physical products sold by 101.

55.  "**Owner's Content**" means everything Uploaded by Owner to the Site or contained on or in the Physical Records (including on the packaging thereof) and/or the Merchandise, including the Masters, Mobile Content, Footage, Artwork, Text and Owner's Marks (including any metadata contained in any of the foregoing).

56.  "**Owner's Marks**" means an name, trademark, service mark, logo or other identification used by Owner, whether as of the Effective Date or at any time during the Term.

57.  "**Owner's Page**" has the meaning set forth in paragraph 1(a) of Exhibit B.

58.  "**Parental Advisory Warning**" means the following notice to consumers that recordings identified by the logo below may contain strong language or depictions of violence, sex or material substance abuse, and that parental guidance is advised.



59.  "**Parties**" means 101 and Owner.

60.  "**Physical Records**" means pre-recorded compact discs and DVDs solely containing Owner's Content and shipped to 101 by Owner as Finished Goods or manufactured by 101.

61.  "**Plans**" means the Basic Plan and the Pro Plan described in Exhibit B.

62.  "**Pre-Release Period**" means the period between the date the Owner's Page is activated on the Site and the Release Date.

63.  "**Pre-Release Threshold**" has the meaning set forth in paragraph 2 of Exhibit H.

64.  "**Products**" means all products that may be sold by 101 under this Agreement, including but not limited to Digital Records, Physical Records, and Merchandise.

65.  "**Pro Plan Payment and Basic Plan Payment**" has the meaning set forth in paragraphs 1 and 2 of Exhibit B.

## EXHIBIT E

## DEFINITIONS

66. "**Release Date**" means the first non-holiday Tuesday that occurs after the date 90 days after the date the Owner's Page is activated on the Site.

67. "**Reserves**" has the meaning set forth in paragraph 1(c) of Exhibit H.

68. "**Retail Distribution**" means sales by 101 of Physical Records to one-stop record distributors and to so-called "brick and mortar" retail outlets (e.g., record stores, Best Buy, etc.) for resale to consumers.

69. "**Physical Record Royalty**" means the royalty payable to Owner for Retail Distribution as set forth in Exhibit 1(b) H.

70. "**Returns**" means any Physical Records and Merchandise returned to 101 for any reason, all Digital Records and other Products for which 101 elects to refund payment to the customer, and all canceled credit card payments.

71. "**Ringtone**" means a segment of a Master which will be made available to be downloaded to Wireless Devices to announce incoming telephone calls on the Wireless Device.

72. "**Royalties**" means the Digital Royalty, Mail Order Royalty, Mobile Royalty, Retail Royalty, and Merchandise Royalty, collectively.

73. "**Sampled Material**" means pre-existing material (including recordings and Compositions and portions thereof) that is owned and/or controlled by any person or entity other than Owner or the Artist.

74. "**Sell-Off Period**" has the meaning set forth in paragraph 9(a) of Exhibit H.

75. "**Service**" has the meaning set forth in paragraph A of the Cover Agreement.

76. "**Set-Up Fee**" means the fee payable to 101 by the Owner, if the Owner elects to have 101 distribute Merchandise in accordance with Exhibit F.

77. "**Site**" has the meaning set forth in paragraph A of the Cover Agreement.

78. "**Site Customer**" means a person who purchases a Product from the Owner's Page.

79. "**Society**" means a performing rights society or organization (such as ASCAP, BMI, SESAC in the United States).

80. "**Surplus Units**" has the meaning set forth in paragraph 1(d) of Exhibit H.

81. "**Synchronization License**" means a license to reproduce and distribute a Composition in the soundtrack of an audiovisual work and to publicly perform the Composition as contained in that work (excluding those public performance rights customarily granted by a Society).

82. "**Term**" means the term of this Agreement.

83. "**Terms**" mean the terms and conditions of this Agreement, existing as of the Effective Date or as modified thereafter.

84. "**Text**" means all words, phrases, slogans, names, symbols, trademarks, service marks, and logos (in addition to the Owner's Marks) Uploaded by Owner to the Site and/or contained on the CDs and/or the Merchandise, including the Artist Identification, liner notes, and credits.

EXHIBIT E

DEFINITIONS

85.   "**This Agreement**" means the Cover Agreement and the exhibits attached thereto.

86.   "**Upload**" means the posting, uploading, inputting, providing, submitting or otherwise transmitting Owner's Content to 101.

87.   "**Video**" means a music video containing a Master as the soundtrack thereof or a full feature film production, which is Uploaded by Owner to the Site and/or contained on a Physical Record.

88.   "**Welcome Email**" means the informational email that 101 will send to Owner after 101 has received a copy of this Agreement signed by Owner.

89.   "**Wireless Devices**" means any type of device made available for sale or distribution to the general public that is capable of accessing and storing the Mobile Content, such as mobile telephones and "personal digital assistants."

**END OF EXHIBIT E**

<u>EXHIBIT F</u>

<u>TERMS SPECIFIC TO THE SALE OF MERCHANDISE</u>

1.     <u>Set-Up Fee</u>: This Exhibit F sets forth the Term specifically related to the sale of Merchandise. In order to activate this feature on the Service, Owner needs to have either (a) purchased the Professional Plan and paid 50% of the Merchandise Set-Up Fee or (b) purchased the Basic plan and paid 100% the Merchandise Set-Up Fee to 101. The Merchandise Set-Up Fee is currently $189.99. If Owner has selected the Merchandise option, Owner is authorizing 101 to charge Owner's credit card for the Set-Up Fee.

2.     <u>Artwork Upload</u>: In order to complete the activation of the Merchandise feature on the Owner's Page, Owner will need to Upload to the Site one or more pieces of Artwork to be reproduced on the Merchandise. [Note: the Artwork can only be Uploaded using on of the following file formats: Photoshop® (_____.psd), Illustrator® (_____.ai) or, least preferred, 300dpi print resolution JPEG.] During the Term, Owner may Upload as many different pieces of Artwork and eliminate any of the previously Uploaded Artwork. In the future, Site Customers visiting the Owner's Page will be able to purchase the Merchandise by choosing what artwork they are purchasing and the type of merchandise they are purchasing (for example, a T-shirt, a sweatshirt, etc.). Once an order is place by a Site Customer, 101 will print the Artwork chosen by the Site Customer onto the type of merchandise chosen by the Customer, and will ship the Merchandise to the Site Customer.

3.     <u>Manner of Sale</u>: The Merchandise will be available for purchase through a "Merchandise" tab on the Owner's Page.

4.     <u>Merchandise Royalty</u>: In accordance with paragraph 44 of Exhibit E, 101 will account to the Owner for the Merchandise Royalty, which will be an amount equal to 80% of the purchase price of the Merchandise (excluding taxes included in the price, the costs of production and excluding all shipping and handling charges), however, Owner will not be entitled to be paid a Merchandise Royalty on any Returns. Owner will be able to view online at the Site daily cumulative sales reports of Merchandise sold.

END OF EXHIBIT F

## EXHIBIT G

## TERMS SPECIFIC TO DIGITAL RECORD SALES

1.     **Availability of Digital Record Sales**: Note: Owner will be given the option of limiting the Digital Record Distribution to the full Album, EP or DVD and, thereby prohibiting Digital Record Distribution of individual Masters or Videos.

2.     **Encoding**: In order to effectuate the Digital Record Distribution of Digital Records, 101 will rip (i.e. encode) the Masters from the Featured Record and prepare the Masters for storage in 101's server so that the Masters and the Featured Record can be downloaded from the Owner's Page by a Site Customer.

3.     **Digital Royalty**: 101 will pay Owner the Digital Royalty for each successful sale of a Digital Record by 101 and for each sale by a Digital Licensee for which 101 receives a non-refundable payment or credit. As used in this Agreement, the "**Digital Royalty**" shall mean the Net Receipts from Digital Record Distribution less the applicable Distribution Fee.

4.     **Digital Record Pricing**: Owner agrees and acknowledges that: (a) the retail price of Digital Records sold from the Site and wholesale price of Digital Records sold through Digital Licensees will be 101's standard pricing, which 101 may change at any time with notice to Owner; (b) 101 does not have variable pricing (in other words, 101's retail prices for Owner's Albums, EPs, DVDs and Masters sold from the Site as Digital Records will be the same as the prices for Albums, EPs, DVDs and Masters for other persons and entities whose digital products are being sold at the same time on the Site; likewise, 101's wholesale prices for Owner's Albums, EPs, DVDs and Masters sold from the Site as Digital Records will be the same as the wholesale prices for Albums, EPs, DVDs and Masters for other persons and entities whose digital products are being sold at the same time by 101 to Digital Licensees); and (c) 101 does not control the retail price that the Digital Licensees charge for Digital Records.

5.     **Security**: Owner agrees and acknowledges that: (a) Digital Downloads will be made available to Site Customers from the Owner's Page as .MP3 or .Wav files; (b) anyone (including the Site Customer) who acquires a copy of a Digital Record as an .MP3 or .Wav file will be technically able to make and distribute an unlimited number of copies of the Digital Record; and (c) 101 will not be liable to Owner or anyone else for the unauthorized copying and distribution of the Digital Records on the Site. Further, Owner agrees and acknowledges that, although each Digital Licensee may have its own file format and security, 101 will not be liable to Owner or anyone else for the unauthorized copying and distribution of the Digital Records obtained by anyone through the Digital Licensees.

**END OF EXHIBIT G**

## EXHIBIT H

## TERMS SPECIFIC TO MAIL ORDER AND RETAIL SALES

1.  **Definitions:** The following capitalized words and phrases have the following meanings when used in this Exhibit E.

    (a)  "**Distribution Services**" means the distribution services provided by 101 to Owner: (i) solicitation, acceptance and processing of orders from the Accounts, (ii) physical distribution, (iii) processing of returns for scrap or return to inventory, (iv) inventory control and warehousing, (v) invoicing and collection to and from the Accounts, (vi) processing and issuance of credits to the Accounts, (vii) shipping services for promotional units of Physical Records and point-of-purchase materials, and (viii) handling, processing, administering and auditing co-operative advertising allowances and issuing credits therefor.

    (b)  "**Physical Record Royalty**" means Net Sales less the following:

        (i)  the applicable Distribution Fee to be retained by 101 for its own account as set forth in paragraph 22 (d) and (e) of Exhibit E,

        (ii) $0.25 for each unit of Returns refurbished and recycled by 101 into inventory,

        (iii)$0.10 for each unit of Returns scrapped by 101,

        (iv)All shipping, freight and insurance charges incurred by or on behalf of 101 for the shipping of units of the Physical Records, and

        (v)  Subject to Owner's approval, any other direct, out-of-pocket expenses paid or incurred by 101 that are attributable to the manufacture, sale, marketing, advertising, promotion, distribution and exploitation of the Physical Records.

    (c)  "**Reserves**" means a 25% reserve withholding for international retail accounts established to offset potential losses from Returns. Notwithstanding, all reserves are to be liquidated on a quarterly basis.

    (d)  "**Surplus Units**" means more than a six (6)-month supply (as determined in 101's good faith business judgment) of units of a particular Physical Record.

2.  **101's Undertakings:** During the Term, 101 will render Distribution Services and shall distribute and sell the Physical Records on Owner's behalf through Mail Order Distribution and, at 101's election, through Retail Distribution. Owner agrees and acknowledges that it is 101's current policy, which 101 may alter on a case by case basis in its sole discretion, to engage in Retail Distribution of an Album, EP or DVD in a Physical Record configuration if the number of digital units sold by 101 through (a) Digital Record Distribution from the Site, and/or (b) Mail Order Distribution to different Site Customers are in aggregate or in excess of 500 total points earned during the portion of the Pre-Release Period that occurs 90 days prior to the scheduled retail Release Date (the "**Pre-Release Threshold**").

3.  **Retail Solicitation:** If the Pre-Release Threshold is met, 101 will, for a minimum of six (6) months, list the Featured Record in its retail catalog in the United States and actively solicit the Featured Record in those markets in the United States that 101 determines have the best potential for Retail Distribution of the Physical Records (for example, markets where the Artist regularly performs "live"), provided that 101's casual or inadvertent failure to do so will not be a breach of this Agreement. 101, however, is not making any representation or warranty that the Featured Record will be ordered or purchased by any Account.

4.  **Promotional Copies:** Owner agrees that 101 may elect to distribute up to five (5) copies of the Initial Shipment and up to 5% of all other Physical Records shipped by Owner to 101 as promotional copies (for example, to Digital Licensees, to record reviewers, for in-store play, etc.). Notwithstanding

<u>EXHIBIT H</u>

<u>TERMS SPECIFIC TO MAIL ORDER AND RETAIL SALES</u>

anything contained in this Agreement to the contrary, no Royalty is payable for Physical Records (or Digital Records) distributed as promotional copies.

5.      <u>Title</u>: Title to units of Physical Records in 101's possession or control shall remain in Owner. Units of Physical Records shall be consigned by Owner to 101 subject to the provisions of this Agreement. 101, as consignee, shall be empowered to pass title to units of Physical Records directly to its customers. 101 shall have the right, as Owner's consignee, to accept any and all Returns from the Accounts. Upon receipt of units of Physical Records so returned to 101 from its customers, title therein shall revert to Owner. All risk of loss to the units of Physical Records shall remain in Owner. Products missing in shipment in route to an Account are Owner's sole responsibility.

6.      <u>Bar Code on Packaging</u>: The back cover packaging of all Physical Records must have a scannable UPC/SKU (bar code) conforming to recording industry standards that specifically identifies the selection and configuration of the Physical Record. 101 will allow Owner to purchase bar code stickers through 101 that will be applied to the Finished Goods by 101.

7.      <u>Catalog Number</u>: 101 will provide Owner with a catalog number that Owner may imprint on the spine of the Physical Record. 101 strongly recommends that Owner utilizes this catalog number. Owner agrees not to imprint or use any other catalog number.

6.      <u>Determination of Price Categories</u>: Owner agrees and acknowledges that: (a) the retail price of Physical Records sold from the Site and wholesale price of Physical Records sold through Retail Distribution will be 101's standard pricing for Albums, EPs and DVDs, which 101 may change at any time; (b) 101 does not have variable pricing (in other words, 101's retail prices for Owner's Albums, EPs and DVDs from the Site will be the same as the retail prices for Albums, EPs and DVDs for other persons and entities whose Albums, EPs and DVDs are being sold at the same time on the Site; likewise, 101's wholesale prices for Owner's Albums, EPs and DVDs sold through Retail Distribution will be the same as the wholesale price for Albums, EPs and DVDs by other persons and entities whose products are being sold at the same time by 101 for Retail Distribution); and (c) 101 does not control the retail price that the Accounts charge for Digital Records or hard copy goods.

8.      <u>Inventory</u>

        (a)  <u>Storage and Shrinkage</u>: 101 shall accept and store all Physical Records delivered to 101 hereunder. 101 shall not be responsible for inventory shrinkage of up to 1% of the total volume of all Physical Records in finished good form delivered to 101 during any calendar year of the Term. With respect to inventory shrinkage in excess of 1%, the sole liability shall be payment to Owner of the Replacement Cost therefor.

        (b)  <u>Surplus Units Determination and Removal</u>: Promptly after 101's written request, Owner shall remove from 101's warehouses, or order the destruction of, at Owner's sole expense, the stock of any Surplus Units of Physical Records. Owner shall be deemed to have ordered the destruction of Surplus Units if, 60 days after the date of the written request from 101, Owner has not given instructions to 101 for the immediate delivery of such Surplus Units to a public warehouse or other non-101 location at Owner's sole expense and for Owner's account.

        (c)  <u>Marking Inventory</u>: 101 may deface the bar code on or re-bar code all units of Physical Records prior to any removal by Owner or delivery to Owner of such units of Physical Records, and Owner shall reimburse 101, promptly following 101's request therefor, with the amount of any direct, out-of-pocket costs incurred by 101 in connection with such defacing or re-bar-coding.

        (d)  <u>Deletions</u>: On not less than 60 days' written notice to 101, Owner may elect to delete any particular Physical Records from 101's distribution and sale obligations hereunder when Owner determines, in Owner's good faith business judgment, such deletion is commercially reasonable. Any

<u>EXHIBIT H</u>

<u>TERMS SPECIFIC TO MAIL ORDER AND RETAIL SALES</u>

Physical Records so deleted shall not be distributed by Owner or any third party during the Term throughout the universe. Returns of deleted Physical Records will be accepted in accordance with 101's standard policies and procedures for such returns.

9.    <u>Post-Term Procedures</u>

    (a)   After the end of the Term, 101 shall have the right, at its election, to cancel or fulfill some or all of the then-existing unshipped orders for the Physical Records. However, 101 may elect to continue to sell any remaining inventory of the Physical Records for a 6-month sell-off period commencing upon the end of the Term (the "**Sell-Off Period**"). Within 30 days after the Term, 101 shall provide Owner with a list of all units of Physical Records in 101's possession on such date. Owner may elect to terminate the Sell-Off Period by paying 101 an amount equal to 25% of 101's retail price for Mail Order Distribution for all of the remaining inventory.

    (b)   Within 30 days after the Sell-Off Period, 101 shall provide Owner with a list of all units of Physical Records in 101's possession on such date. Within 60 days after the end of the Sell-Off Period, Owner shall remove from 101's warehouses, at Owner's sole expense: (i) all units of Physical Records in 101's possession, and (ii) all other materials provided by Owner to 101.

    (c)   101 may notify the Accounts that 101 will no longer accept any further Returns. Owner shall accept all Returns after the Term; however, 101 may elect to honor any open Return authorizations. Owner shall accept the return from 101 of all units of Physical Records distributed during the Term that are Returned by the Accounts from time to time thereafter, and Owner shall re-purchase such units of Physical Records from 101 for an amount equal to the credit given to the Account for the applicable Return. Any Returns received by 101 after the Term will be removed by Owner, at Owner's sole expense, within 30 days after written request by 101.

    (d)   Owner agrees that 101 has the right, at Owner's sole expense, to remove the bar-coding or to replace bar-coding of all inventory of Physical Records returned to Owner.

    (e)   101 will have the right, at Owner's sole expense, to destroy any inventory or Owner materials that are not timely removed from 101's warehouse.

    (f)   The end of the Term does not discharge Owner or 101 from their respective obligations to pay any amounts owing under this Agreement. As long as any amount so owing to 101 by Owner has not been paid in full, in addition to 101's other rights and remedies, 101 will have the right to reimburse itself from any amounts otherwise payable to Owner under this Agreement.

10.   <u>Security Interest</u>: To induce 101 to enter into this Agreement, Owner hereby irrevocably grants to 101 a first priority security interest in and to 101's inventory of Physical Records and any proceeds derived from the sale of such inventory (the "**Collateral**") to secure the payment of any amounts that Owner is required to pay to 101 pursuant to this Agreement. Owner shall take all action reasonably necessary or as 101 shall reasonably request to create, confirm or preserve the security interest granted herein, perfect a first priority lien in the Collateral and enable 101 to exercise and enforce the rights, remedies and powers provided to it hereunder, including the execution and delivery to 101 of UCC-1 financing statements and agreements and documents evidencing the security interest in Owner's intellectual property, in each case, in appropriate form for filing in all appropriate filing jurisdictions. Owner warrants and represents that Owner has not granted and will not grant or allow to exist any security interest or lien of any kind in the Collateral other than the security interest granted herein.

END OF EXHIBIT H

## EXHIBIT I

## TERMS SPECIFIC TO THE SALE OF MOBILE CONTENT

1.   **Uploading:** If Owner desires to make Ringtones available for sale on the Owner's Page, Owner must Upload to the Site edits of the applicable Masters that will be converted into a Ringtone. Each edit cannot be more than thirty (30) seconds in length and cannot no larger than 300 KB. Likewise, if Owner desires to make other Mobile Content (i.e., digital wallpaper) available for sale on the Owner's Page, Owner must Upload to the applicable photographs and images to the Site.

2.   **Encoding:** In order to effectuate the sale of Mobile Content, 101 (or its contractor) will need to encode the Mobile Content so that (a) it is capable of being digitally transmitted and played and/or displayed on specific Wireless Devices, (b) the Mobile Content can be stored on 101's server, and (c) the Mobile Content can be purchased from the Owner's Page by a Site Customer. 101 is not making any representation or warranty as to the time it will take to encode the Mobile Content so that is available for sale on the Owner's Page or that the Mobile Content will be available on any particular brand or model of Wireless Device but will use all reasonable efforts to do so. Owner will not have the right to obtain at any time copies of any of the encoded Mobile Content source files.

3.   **Mobile Royalty:** 101 will pay Owner the Mobile Royalty for each successful sale of Mobile Content by 101 for which 101 receives a non-refundable payment or credit. As used in this Agreement, the **"Mobile Royalty"** shall mean the Net Mobile Receipts less the Distribution Fee set forth in paragraph 22(c) of Exhibit E.

4.   **Mobile Content Pricing:** Owner agrees and acknowledges that: (a) the retail price of Mobile Content sold from the Site will be designated by 101, which 101 may change at any time; and (b) 101 does not have variable pricing (in other words, 101's retail prices for Owner's Mobile Content sold from the Site as Mobile Content will be the same as the prices for the applicable type of Mobile Content for other persons and entities whose mobile content is being sold at the same time on the Site). 101 does not control the retail price that Licensees charge for ring tones.

5.   **Security:** Owner agrees and acknowledges that: (a) Mobile Content will be made available to Site Customers from the Owner's Page as digital files; (b) anyone (including the Site Customer) who acquires a copy of a Mobile Content as a digital file will be technically able to make and distribute an unlimited number of copies of such digital files; and (c) 101 will not be liable to Owner or anyone else for the unauthorized copying and distribution of the Mobile Content.

**END OF EXHIBIT I**

<u>EXHIBIT J</u>

<u>GENERAL TERMS AND CONDITIONS</u>

1.     <u>Term</u>: The Term shall commence on the Effective Date and shall end on (a) the date that Owner removes Owner's Page from the Service, or (b) the date thirty (30) days after Owner terminates the Term in accordance with paragraph 19(a) below. If Owner does not remove Owner's Page from the service or terminate with written notice, this Agreement will automatically reset for a consecutive twelve (12) month term.

2.     <u>Charges to Owner</u>

       (a)   Owner agree to pay, in advance, all fees and charges that relate to Owner's use of the Service ("**Charges**"), in accordance with the rates, terms and conditions set forth in this Agreement or established from time to time by 101. The Charges and the terms and conditions that relate thereto will be posted on the Site or otherwise made available to Owner by 101. Owner will indemnify and hold 101 harmless for any federal, state and local sales, use, value added, excise, duty and any other taxes assessed with respect to the sale and distribution of the Digital Records, Physical Records and Merchandise, other than taxes based on 101's United States net income. 101 reserves the right to change the amount of the Charges from time to time in its sole discretion. All Charges are payable only in the currency of the United States. 101 reserves the right to modify the form of payment it will accept, at any time and in its sole discretion.

       (b)   In addition to making payments through PayPal®, 101 also currently accepts the following credit cards: Visa, MasterCard, and American Express. Owner hereby authorizes 101 to automatically charge the card listed in Owner's account for all Charges due. Recurring Charges will be charged to the credit or debit card number listed in Owner's account until Owner cancel Owner's account in accordance with 101's cancellation policy. Owner is responsible for keeping the credit card information in Owner's account up to date, including credit card account numbers, expiration dates, CVV2 numbers, billing address, and any information that may prohibit 101 from charging Owner's account.

       (c)   If Owner fails to pay any Charges within 15 days after the applicable due date, late charges of the lesser of one and one-half per cent (1.5%) per month (i.e. 18% per annum) or the maximum amount allowable under applicable law shall also become payable by Owner to 101, along with attorney and collection fees, until paid in full. Payments made by Owner will first be applied to such late charges and then to the outstanding Charges. Payment is non-refundable. Reactivation of accounts suspended for non-payment will be subject to a reactivation fee of $35.00. Owner agrees to pay a yearly storage fee of $19.98 per Featured Record. The fee will be charged every twelve (12) months unless Owner terminates the Term in accordance with paragraph 1 of this Exhibit J. This fee is covered in the initial Basic Plan Payment or Pro Plan Payment for the first year.

       (d)   Owner can supply 101 with a properly formatted copy of the Featured Video in one of the following formats: Uncompressed Quick Time .mov. The cost for 101 to encode and deliver a music video or full length film for the digital services  (all territories included) by length:

  * 0 to 5:00 minutes: $85
  * 5:01 to 10:00 minutes: $150
  * 10:01 to 20:00 minutes: $220
  * 20:01 to 30:00 minutes: $300
  * 30:01 to 40:00 minutes: $375
  * 40:01 to 90:00 minutes: $450

<u>EXHIBIT J</u>

<u>GENERAL TERMS AND CONDITIONS</u>

3.    <u>**Owner's Grant of Rights**</u>: Owner hereby acknowledges and agrees that, as between Owner and 101, all of Owner's Content is owned by, and shall remain the sole property of, Owner, and 101 does not claim any ownership in Owner's Content. However, Owner agrees that by Uploading Owner's Content to 101 and by using the Service, Owner shall have thereby granted to 101, throughout the Term and universe, the non-exclusive right and authorization, on a royalty-free basis, to do the following, whether utilizing technology now known or hereafter devised:

(a)   sell and otherwise distribute the Products as an non-exclusive distributor;

(b)   make copies of and otherwise reproduce the Owner's Content on 101's servers, the Owner's Page and otherwise on the Site;

(c)   display, exhibit and publicly perform the Owner's Content on the Owner's Page and otherwise on the Site, provided that the right to publicly perform Non-Controlled Compositions on the Site in the United States shall be available to 101 through either ASCAP or BMI (without limiting the generality of the foregoing, Owner hereby grants 101 the right to publicly perform the Controlled Compositions, the Masters and the Videos on the Site throughout the universe);

(d)   re-encode Owner's Content (including the reproduction and conversion of Masters into digital formats) and edit Owner's Content to comply with 101's policies and guidelines;

(e)   reproduce, display and otherwise use the professional name of the Artist, Owner's Name, and the names of the Featured Record and the Masters on the Site and in advertisements, promotional materials, marketing materials and publicity of or relating to 101, provided that 101 shall not use the Artist name or the Owner's Marks as an endorsement of the Service;

(f)   use and distribute Copyright Management Information as embodied in digital Masters and Videos;

(g)   cache the Owner's Content, which caching will not constitute an infringement of any of Owner's Content or rights or those of any third party;

(h)   otherwise use, copy, distribute, transmit, display, edit, delete, publish and translate the Owner's Content to the extent reasonably required by 101 for the purposes of rendering and operating the Service and to insure adherence to or enforce the terms of this Agreement; and

(i)   sublicense to third parties any or all of the rights granted to 101 under this Agreement.

4.    <u>**101's Intellectual Property**</u>: Owner hereby acknowledges and agrees that, as between Owner and 101, the Site and all of the technology and software underlying the Site and the Service ("**Software**") is the property of 101 and its affiliates. Owner agrees not to modify the Software in any manner or form or to use modified versions of the Software, including for the purpose of obtaining unauthorized access to the Site.

5.    <u>**Owner's Representations and Warranties**</u>: Owner agrees, represents and warrants that:

(a)   Owner has full right, power and authority to enter into and perform this Agreement. Each person constituting Owner or executing the Cover Agreement is 18 years old or older as of the Effective Date.

(b)   Owner owns, throughout the universe and throughout the Term, all right, title and interest in and to the Owner's Content, including the copyrights, trademarks and service marks contained therein, or has obtained, prior to Uploading the applicable Owner's Content to the Site and/or shipping to 101 the applicable Physical Record, Clearances to the extent it does not own such right, title or interest. Owner

<u>EXHIBIT J</u>

<u>GENERAL TERMS AND CONDITIONS</u>

possess the right to sell and otherwise distribute the Product through Digital Record Distribution, Mail Order Distribution, and Retail Distribution. There are no liens or other encumbrances of any nature on any of the Owner's Content and/or the Physical Records, other than as granted to 101 as set forth in paragraph 10 of Exhibit H.

(c)   All information that Owner provides to 101, whether in the Cover Agreement or otherwise, is correct and complete. Inaccurate, false, misleading or incomplete information or failure to correct or notify 101 of any change within 5 business days from the date of any change or upon inquiry of 101 will constitute a material breach of this Agreement.

(d)   Neither the Owner's Content nor anything contained in the Owner's Content infringes upon the copyright, patent, trademark, service mark, trade secret, moral right or other proprietary right of any person or entity, defames any person or entity, or violates any person or entity's rights of publicity or privacy. Owner has acquired or will acquire all clearances necessary for hypertext links to third party websites contained in the Owner's Content.

(e)   Owner shall be solely responsible for: (i) any and all sales and use taxes levied on any of the amounts payable to Owner under this Agreement, (ii) all recording, production and other costs incurred in the creation of the Owner's Content and Physical Records, and (iii) all costs incurred in the manufacturing and packaging of units of Physical Records.

(f)   Owner has paid or shall pay and account to all of the Income Participants, and neither 101, the Accounts, nor the Licensees shall be legally obligated to make any payments whatsoever to any of the Income Participants with respect to the Owner's Content.

(g)   With respect to all of the Non-Controlled Compositions contained in the Masters, Owner has entered into Mechanical Licenses for the United States and Canada with the music publisher of the Non-Controlled Compositions. Likewise, with respect to all of the Non-Controlled Compositions contained in the Footage, Owner has entered into Synchronization Licenses for the world with the music publisher of the Non-Controlled Compositions. The right to publicly perform all of the Non-Controlled Compositions on the Owner's Page or otherwise on the Site in the United States is available through either ASCAP or BMI.

(h)   Owner's Content does not contain any Sampled Material for which a Clearance has not been obtained.

(i)   Owner has the right to include the Artist Identification in the Products and on the Owner's Page, and has the right to include the names, photographs, likenesses, voices, signatures, biographical materials and other personal identification of all of the other persons and entities whose identification is included in the Owner's Content.

(j)   None of the Owner's Content violates any law, statute, ordinance, or regulation.

(k)   Owner has not previously entered into any agreement that will interfere with Owner's performance of its obligations under this Agreement.

6.   <u>Parental Advisory or General Ratings</u>

(a)   In creating the Owner's Page, Owner shall insert a Parental Advisory Warning (including the logo, as applicable) or the authorized rating from the Motion Picture Association of America on all Owner's Content that warrants a Parental Advisory Warning. Further, each Physical Record shall have a Parental Advisory Warning or rating if any of the Owner's Content thereon warrants a Parental Advisory. If applicable, Owner will clearly and conspicuously display the Parental Advisory Warning logo in black and white in a legible, non-removable form on the Product cover artwork (as opposed to on any wrapper, jewel-case, removable sticker, or cellophane covering). The Owner's Page shall clearly and

## EXHIBIT J

## GENERAL TERMS AND CONDITIONS

conspicuously communicate the presence of all Parental Advisory Label Content made available via the Owner's Page, as well as the availability of a corresponding edited version, if any.

(b)   If 101 determines, in its sole judgment, that any Owner's Content or Product warrants a Parental Advisory Warning, Owner shall have the right, at Owner's sole cost and expense, to affix a Parental Advisory Warning thereon.

(c)   Notwithstanding anything contained in this Agreement to the contrary: (i) 101 may, without notice or liability to Owner, refuse to distribute any Products that 101 for any reason finds to be objectionable, in 101's sole discretion, whether or not a Parental Advisory Warning has been applied and/or or which 101 believes may be subject to a Claim; and (ii) 101 may, without notice or liability to Owner, delete, remove, disable or otherwise eliminate any of Owner's Content on the Owner's Page that 101 for any reason finds to be objectionable, in 101's sole discretion, whether or not a Parental Advisory Warning has been applied and/or which 101 believes may be subject to a Claim or which, in fact, is subject to a Claim. 101's rights, however, do not obligate 101 to monitor or exert editorial control over the Owner's Content, and Owner agrees and acknowledges that 101 has no obligation to censor or monitor Owner's Content or Owner's use of the Service. 101 shall have the right, without any liability to Owner, to decline to manufacture and/or distribute and sell any of the Products (or, as applicable, to cease the manufacture and/or distribution and sale thereof).

7.      **Username**: If Owner chooses a username for the Service that 101 in its sole discretion finds objectionable or which 101 believes may be subject to a claim, 101 reserves the right, without prior notice to Owner, to automatically change such username, delete the Owner Page, deny Owner access to the Site or the Owner Page, or any combination of the foregoing options.

8.      **Access to the Site**: Unauthorized access to the Site or to any web pages within the Site is a breach of these Terms and a violation of the law. Owner agrees not to access the Site by any means other than through the interface that is provided by 101 for use in accessing the Site. Owner agrees not to use any automated means, including agents, robots, scripts, or spiders, to access, monitor, or copy any part of the Site.

9.      **Protecting Owner's Password**: Owner agrees to provide true, accurate, current, and complete information about Owner as requested in the Service's activation process and to update such information regularly. Owner shall not reveal Owner's subscription password to anyone, and Owner shall not use anyone else's password to the Service. Owner is responsible for maintaining the confidentiality of Owner's account and password to the Service. Unauthorized access to the Service by Owner is a breach of the Agreement and a violation of the law. Owner agrees to immediately notify 101 of any unauthorized use of Owner's password or account or any other breach of security on the Site or the Owner's Page.

10.     **Wrongful Uses of the Service**: Owner shall not use the Service:

(a)   in any illegal manner,

(b)   to defame, abuse, harass, stalk, threaten, or otherwise violate the legal right of others, or to transmit or post false, misleading, defamatory, libelous, harassing, abusive, or threatening language or information,

(c)   to Upload or otherwise disseminate any defamatory, racist, sexist, homophobic or other discriminatory material,

(d)   to Upload files that contain viruses, corrupted files, or any other similar software or programs that may damage the operation of another person's computer, to distribute Internet viruses, worms, Trojan horses, or other similar destructive activities, or to distribute information regarding the creation of

<u>EXHIBIT J</u>

<u>GENERAL TERMS AND CONDITIONS</u>

and sending Internet viruses, worms, Trojan horses, pinging, flooding, mail bombing, or denial of service attacks,

(e) to conduct, advertise, transmit or otherwise make available surveys, contests, pyramid schemes or chain letters, or to engage in activities that are determined to be illegal, including advertising, transmitting, or otherwise making available ponzi schemes, pyramid schemes, phishing scams, fraudulently charging credit cards, and pirating software,

(f) to download any file posted by another user of the Service that Owner knows or reasonably should know cannot be legally distributed in such manner,

(g) to falsify or delete any author attributions, legal or other notices or proprietary designations or labels of the origin or source of software or other material contained in a file that is Uploaded,

(h) to engage in sending unsolicited bulk and/or commercial messages over the Internet (known as "spamming"),

(i) to maintain an open SMTP relay,

(j) to facilitate a violation of this Agreement by any other person or entity,

(k) to advertise, transmit or otherwise make available any software, program, product, or service that is designed to violate this Agreement (which includes the facilitation of the means to spam, initiation of pinging, flooding, mail bombing, denial of service attacks, and piracy of software),

(l) to advertise or promote any product or service other than the Products and the Artist,

(m) to infringe upon or misappropriate the intellectual property rights of others, including copyrights, trademarks, service marks, trade secrets, software piracy, and patents held by any third party,

(n) to violate the privacy, publicity, or other personal rights of others,

(o) to collect and/or store personal information about other users and visitors to the Owner's Page or elsewhere on the Site (including Site Customers),

(p) to advertise, transmit, store, post, display, or otherwise make available child pornography or other forms of pornography or obscene speech or material (Owner acknowledges that 101 may notify law enforcement agencies when it becomes aware of the presence of child pornography on or being transmitted through 101 Services),

(q) to advocate, promote or provide assistance in carrying out violence or any other unlawful activity against any persons, animals or any governments, businesses or other entities,

(r) to promote products or services that involve a significant risk of death or injury to any persons, or damage to business or other entities or property, or to describe or display a weapon, or parts of weapons, or manuals for assembling any weapon, including firearms, ammunition, explosives, grenades, bombs and caustic or other dangerous substances,

(s) to engage in any fraudulent activity, including but not limited to the forging or misrepresentation of message headers, whether in whole or in part, to mask the originator of the message, and the impersonation of any other Owner, Artist or person,

<u>EXHIBIT J</u>

<u>GENERAL TERMS AND CONDITIONS</u>

(t)   to access illegally or without authorization computers, accounts, or networks belonging to any person or entity (including 101), or attempting to penetrate security measures of another individual's or entity's (including 101) system (often known as "hacking"),

(u)   to link or connect to any peer-to-peer or other file-sharing sites,

(v)   to modify or adapt any website so as to falsely imply that it has any connection with 101,

(w)   to engage in any activity that might be used as a precursor to an attempted system penetration (e.g., port scan, stealth scan, or other information gathering activity),

(x)   to engage in activities that disrupt the use of or interfere with the ability of others to effectively use the Service or Site,

(y)   to export encryption software over the Internet or otherwise,

(z)   to export software from the Service in violation of U.S. export laws,

(aa) to engage in or promote gambling or to entice others to gamble,

(bb) to illegally display or promote any type(s) of intoxicant, alcoholic beverage, cigarettes or controlled or illegal substance,

(cc) to engage in any other activity, whether lawful or unlawful, that 101 in its sole discretion determines to be harmful to customers, operations, reputation, goodwill, or customer relations, or

(dd) to provide instructions or otherwise assist others to engage in any of the activities listed above.

11.   <u>User Information</u>: As between Owner and 101, 101 will be the sole and exclusive owner of any and all information collected by 101 from users and visitors to the Owner's Page and otherwise to the Site (including information collected from Site Customers). Owner will not have any right whatsoever to access, disseminate or otherwise use any such information.

12.   <u>Royalty Accountings</u>

(a)   Prior to the date 30 days after the Release Date, 101 shall compute the Royalties payable to Owner for such accounting period and each month thereafter and may send Owner, by email, an accounting statement covering those Royalties. If the total Royalties payable to Owner for any accounting period are less than $100.00, then 101 may apply such Royalties to the next accounting period until the Royalties to Owner are equal to or in excess of $100.00. Owner agrees and acknowledge that 101's books and records may consist, in part, of accounting statements rendered to 101 by Digital Licensees, other Licensees, and other third parties, and that 101 has the absolute right to rely on such statements in computing the Royalties. Owner may request payment by check, Paypal or direct deposit. If Royalties are less than $100.00 US, there will be an admin fee for each paper check and any processor fees (i.e. Paypal or wiring fees) will be charged to Owner.

(b)   Owner or a certified public accountant or chartered accountant appointed by Owner will have the right, at its own expense, upon no less than 30 days prior notice to 101, to examine the books and records maintained by 101 solely for purposes of verifying the accuracy of such accounting statements rendered to Owner by 101; provided such firm is not then currently engaged in an outstanding examination of 101's books and records and is not being paid, directly or indirectly, by Owner on any type of contingency basis, and provided Owner or such accountant has executed 101's standard confidentiality agreement. Such examination shall take place at 101's regular place of business where the books and

EXHIBIT J

**GENERAL TERMS AND CONDITIONS**

records are regularly maintained, shall be of a reasonable duration, and only during normal business hours. 101 shall not be required to submit to such an examination more than once during any 12-month period or more than once per accounting statement. Legal action with respect to a specific accounting statement shall be barred if not commenced in a court of competent jurisdiction within one (1) year after such statement is received by Owner (or deemed received as provided below). For the purposes of calculating such twelve (12)-month period, Owner shall be deemed to have received a statement when due unless 101 receives from Owner notice of non-receipt within 90 days thereafter. However, 101's failure to give such notice shall not affect Owner's right to receive such statement after such 90-day period.

13. **Indemnity**: Owner hereby agrees to indemnify, defend, and hold 101, the Accounts, the Licensees, and all their respective officers, directors, owners, and agents (collectively, the **"101 Parties"**) harmless from and against any and all liability, losses, costs, and expenses (including attorneys' fees) incurred by any 101 Party in connection with (a) any Claim, or (b) any use or alleged use of Owner's account or password by any person or entity, whether or not authorized by Owner. 101 shall promptly notify Owner of any such claim, and by obtaining, posting and maintaining an appropriate bond for 101's benefit, Owner may assume control of the defense of such claim, provided that 101 shall have the right in all events to participate in the defense thereof. 101 reserves the right to assume the exclusive defense and control of any matter otherwise subject to indemnification by Owner, and, in such case, Owner agrees to cooperate fully with 101's defense thereof.

14. **101 Remedies**

  (a)   In the event of a Claim or a breach or threatened breach by Owner of any of the Terms, 101 shall have the right, without waiving or limiting any other right available to 101 (including 101's termination rights under paragraph 19 of this Exhibit J), to suspend any or all of 101's obligations under this Agreement, to take down any or all of Owner's Content from the Site, and/or to suspend or terminate the sale of the Products. The decision of whether or not to reinstate any or all of the foregoing shall be determined by 101 in its sole discretion.

  (b)   The rights, powers and remedies of 101 in this Agreement, including the right to suspend, restrict or terminate any or all of the Services and/or the Term, are cumulative and in addition to and not in substitution for any right, power or remedy that may be available to 101 at law or in equity, and 101 may decline to exercise any of such rights or remedies as 101 may deem fit without jeopardizing any future exercise of the rights and remedies available to 101.

15. **Disclaimers**: Owner agrees and acknowledges that:

  (a)   Owner's use of the Service, or any portion thereof, is void where prohibited.

  (b)   101 disclaims any responsibility for the deletion, failure to store, misdelivery, or untimely delivery of any Products, information or materials. Although 101's goal is to ensure timely processing of the Services, 101 does not guarantee that Owner's submission will be processed within the expected time frames associated with any 101 system. 101 will not have any liability to Owner as a result of service outages that are caused by 101's maintenance on the servers and other technology that underlie the Service, failures of 101's service providers (including telecommunications, hosting, and power providers), computer viruses, natural disasters, or other destruction to or damage of 101's facilities, an act of God, war, civil disturbance, terrorism, or other cause beyond 101's reasonable control.

  (c)   The Service will be provided "as is." 101 is not making any representation or warranty that the Service will be uninterrupted or error-free. 101 is not making any representation or warranty of any kind, whether express or implied, including warranties of title or implied warranties of merchantability or fitness for a particular purpose, with respect to the Service. However, some states and/or countries do not allow exclusion of implied warranties or limitation of liability for incidental or consequential damages, so

## EXHIBIT J

## GENERAL TERMS AND CONDITIONS

the above limitations or exclusions may not apply to Owner. In such states, 101's liability and that of 101's third-party content providers and their respective agents shall be limited to the greatest extent permitted by law.

(d)   The Service has certain limitations that may change from time to time (e.g., permissible file sizes, limit on use of Upload and download bandwidth, and file types that may be uploaded).

(e)   101 will not be liable for any claims, demands or damages of any kind or nature arising out of any dispute between Owner and any other user or visitor to the Site (including a Site Customer). 101 reserves the right, but will not be obligated, to monitor any such dispute.

(f)   101 reserves the right to terminate the Service at any time without notice.

(g)   Owner Pages created and posted by Service Members may contain links to other websites. 101 is not responsible for the content, accuracy or opinions expressed on such websites, and such websites are in no way investigated, monitored or checked for accuracy or completeness by 101. Inclusion of any linked website on the Service does not imply approval or endorsement by 101 of the linked website. When Owner accesses such third-party sites, Owner does so at Owner's own risk.

(h)   In no event shall Owner hold 101 liable for any losses resulting from any fraud perpetrated on Owner, 101 or anyone else relating to or stemming from transactions contemplated by this Agreement or from any other claims based on the actions or inactions of other users of or visitors to the Service.

16.   **Limitation of Liability**

(a)   Notwithstanding any other provision of this Agreement, in no event shall 101, its parents, subsidiaries, affiliates and Owner's and their respective officers, directors, agents, employees, licensors, suppliers, resellers and distributors (collectively, the "**101 Entities**" and each, an "**101 Entity**") be liable for any direct, indirect, special, incidental, consequential or punitive damages, or any other damages or losses whatsoever, including damages for loss of profits, goodwill, opportunity, earnings, or use of data, arising directly or indirectly from or related to this Agreement or the Service, regardless of the cause of action and even if one (1) or more of the 101 Entities have been advised of the possibility of such damages or losses, including damages or losses arising from or in any way related to loss of or damage to any Owner Content as Uploaded to the Site, or for any delays, outages or interruptions of the Service or any aspect thereof, or for any errors, interruptions, mistakes, omissions, non-delivery, incorrect delivery, viruses or defects in the transmission of any information, material or data over or through 101's systems or networks or the systems or networks of third parties as a result of electrical failure, power outages or outages of other utilities, security breaches, bugs and virus attacks, acts of god, force majeure events, acts of terrorism or other acts or conditions beyond the control of 101.

(b)   Owner agrees that, regardless of any statute or law to the contrary, any claim or cause of action against 101 arising out of or related to use of the Site or these Terms must be filed within one (1) year after such claim or cause of action arises, or be forever barred.

17.   **Arbitration:** Any dispute or controversy arising out of or relating to this Agreement shall be settled by binding arbitration in accordance with the Rules of the American Arbitration Association ("AAA") in the State of Arizona, subject to the laws of that state, other than its conflicts of law principles. A single arbitrator engaged in the practice of law, who is knowledgeable about intellectual property transactions, shall conduct the arbitration. The arbitrator shall be selected in accordance with AAA procedures from a list of qualified people maintained by AAA. The arbitration shall be conducted in Phoenix, Arizona. There shall be no discovery other than the exchange of information which is provided to the arbitrator by the parties. Written reasons for the arbitrator's decisions shall be complete and explicit, but limited to only those issues necessary to support the award. Each party shall bear its costs and attorney's fees of any arbitration. The arbitrator shall assess his or her costs, fees and expenses against the party losing the

*or in the state of Georgia*

EXHIBIT J

GENERAL TERMS AND CONDITIONS

case, unless the arbitrator believes that neither party is the clear loser, in which case the arbitrator shall divide such fees, costs and expenses equally. The arbitrator's decision and award shall be final and binding, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Any duty to arbitrate under this Agreement shall remain in effect and enforceable after expiration or termination of the Term for any reason. Notwithstanding the foregoing, the foregoing provisions shall not be applicable in connection with any legal action taken by 101 that includes an attempt by 101 to obtain injunctive or other equitable relief to prevent or remedy any breach or threatened breach by Owner of this Agreement. Any process in such action may, among other methods, be served upon Owner by mailing it to Owner at the address set forth in paragraph 2 of the Cover Agreement or Owner's address as designated pursuant to paragraph 20 of this Exhibit G. Such mailing will be deemed to have the same force and effect as personal service upon Owner.

18.     **Infringement Policy:** It is the policy of 101 to respect the legitimate rights of copyright and other intellectual property owners and it is the policy to terminate the accounts of any person who repeatedly violates the intellectual property rights of others. Pursuant to the Digital Millennium Copyright Act, 17 U.S.C. Section 512 (the "**DMCA**"), 101 has designated an agent (specified below) to receive notifications of claimed copyright infringement on its Site: **compliance@101d.com.**

19.     Termination of the Term and/or Service

        (a)  Owner may terminate the Term and withdraw from the Service by utilizing the 'remove' button on the Administrative Page on the Site. This button will remove the Featured Masters from all services effective 30 days after the button is utilized. Promptly after the end of the Term, 101 will remove the Owner's Page and the Owner's Content from the Site.

        (b)  101 reserves the right, in 101's sole discretion, to restrict, suspend, or terminate Owner's access to any or all of the Service at any time for any reason without prior notice or liability. 101 may change, suspend, or discontinue any or all aspects of the Service at any time, including the availability of any Service feature or content, without prior notice or liability. 101 will notify Owner of any such change, suspension, or discontinuation. Any termination of the Term shall not relieve Owner of any obligations to pay Charges. 101 shall not be obligated to notify any third party of the termination of Owner's account or provide any termination assistance. Without limiting the generality of the foregoing, 101 shall have no obligation to forward any email messages, data, information or other content related to Owner's use of the Services, and Owner acknowledges that all such email messages, data, information and content may be deleted by 101.

        (c)  If 101 has reasonable grounds to suspect that any of the information provided by Owner to 101 is inaccurate, false, misleading or incomplete, 101 has the right, in its sole discretion to terminate the Owner's Page and use of the Service and close Owner's account.

        (d)  If 101 terminates the Term for any reason, Owner shall not be entitled to the refund of any unused portion of the Charges.

20.     **Notices:** In order to be effective, all notices to 101 under this Agreement must be in writing and sent to the attention of "Legal Department" at 101's address set forth on the Cover Agreement or to such other address as 101 may designate in a notice on the Site. All notices sent under this Agreement to 101 must be sent only (a) by registered or certified mail (return receipt requested), (b) by overnight air courier if such courier actually provides proof of receipt, or (c) by utilizing the legal notice button on the Administrative Page, provided that 101 acknowledges its receipt by a return email to Owner. The day 101 actually receives such notice will be deemed the date of the giving thereof. 101 may be required by state or federal law to notify Owner of certain events or information. Owner hereby acknowledges and consents that such notices will be effective upon 101 posting them on the Site or delivering them to Owner through e-mail. If Owner fails to provide 101 with accurate and up to date information, 101 cannot be held liable for failure to notify Owner of any such events or information.

<u>EXHIBIT J</u>

<u>GENERAL TERMS AND CONDITIONS</u>

(g)   This Agreement shall be deemed to have been entered into in the State of Arizona and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of Arizona applicable to contracts entered into and performed entirely within the State of Arizona.

(h)   The parties hereto intend this Agreement as a final expression of their understanding and agreement with respect to the subject matter hereof and as a complete and exclusive statement of the terms thereof; this Agreement supersedes all prior and contemporaneous negotiations, understandings, and agreements between the parties hereto with respect to the subject matter hereof.

(i)   Nothing in this Agreement shall be construed to require the commission of any act contrary to law, and wherever there is a conflict between any provisions of this Agreement and any statute, law, ordinance, order or regulation contrary to which the parties hereto have no legal right to contract, such statute, law, ordinance, order or regulation shall prevail; provided that, in such event, (i) the provision of this Agreement so affected shall be limited only to the extent necessary to permit compliance with the minimum legal requirements, (ii) no other provisions of this Agreement shall be affected thereby, and (iii) all such other provisions shall remain in full force and effect. The parties hereto shall negotiate in good faith to replace any invalid, illegal or unenforceable provision (the "Invalid Provision") with a valid provision, the effect of which comes as close as possible to that of the Invalid Provision.

(j)   No waiver by 101, whether expressed or implied, of any provision of this Agreement or default hereunder shall affect 101's right to thereafter enforce such provision or to exercise the right or remedy set forth in this Agreement in the event of any other default, whether or not similar.

(k)   Words in the singular number shall include the plural, and vice versa. Whenever examples are used in this Agreement with the words "including," "for example," "e.g.," "such as," "etc. " or any derivation thereof, such examples are intended to be illustrative and not in limitation thereof.

(l)   The paragraph headings herein are used solely for convenience and shall not be used in the interpretation or construction of this Agreement.

(m)   For the avoidance of doubt, Terms that by their meaning are intended to survive the Term, including the disclaimers of warranty and limitations and exclusions of liability and payment obligations contained under this Agreement, shall survive the Term.

24.   <u>Modifications</u>: 101 reserves the right, in its sole discretion, to modify any of the Terms (including the Charges), at any time, effective upon the date 101 posts new Terms on the Site. Owner's continued use of the Service thereafter constitutes Owner's binding acceptance of such new Terms. If any future modification of the Terms is not acceptable to Owner, Owner agrees to email 101 at **compliance@101d.com** to have 101 delete the Owner's Page and remove all of Owner's Content from the Site within thirty (30) days of such notice.

END OF EXHIBIT J

<u>EXHIBIT K</u>

<u>FORM W9</u>

EXHIBIT "C"

```
                       PLIES_project_ledger (1)
Transaction Date          Description      Transaction Type        Amount   Balance
1-Jun-11       Jun 2011 Retail Sales   Return   ($7.00)  "($7,118.73)"
1-Jun-11       Jun 2011 Digital Sales  Sales Credit   $60.91  "($7,111.73)"
1-May-11       May 2011 Digital Sales  Sales Credit   $19.91  "($7,172.64)"
1-May-11       May 2011 Retail Sales   Sales Credit   $42.00  "($7,192.55)"
1-May-11       May 2011 Retail Sales   Return   ($7.00)  "($7,234.55)"
1-Apr-11       Apr 2011 Digital Sales  Sales Credit   $25.13  "($7,227.55)"
1-Mar-11       Mar 2011 Digital Sales  Sales Credit   $21.29  "($7,252.68)"
1-Mar-11       Mar 2011 Retail Sales   Sales Credit   $84.00  "($7,273.97)"
1-Mar-11       Mar 2011 Retail Sales   Return   ($7.00)  "($7,357.97)"
1-Feb-11       Feb 2011 Retail Sales   Sales Credit   $84.00  "($7,350.97)"
1-Feb-11       Feb 2011 Digital Sales  Sales Credit   $8.93  "($7,434.97)"
1-Jan-11       Jan 2011 Digital Sales  Sales Credit   $0.49  "($7,443.90)"
1-Jan-11       Jan 2011 Retail Sales   Sales Credit   $94.50  "($7,444.39)"
1-Dec-10       Dec 2010 Retail Sales   Return   ($42.00)       "($7,538.89)"
1-Dec-10       Dec 2010 Retail Sales   Sales Credit   $115.50
"($7,496.89)"
1-Dec-10       Dec 2010 Digital Sales  Sales Credit   $16.86  "($7,612.39)"
1-Nov-10       Nov 2010 Digital Sales  Sales Credit   $24.50  "($7,629.25)"
1-Nov-10       Nov 2010 Retail Sales   Return   ($133.00)      "($7,653.75)"
1-Oct-10       Oct 2010 Digital Sales  Sales Credit   $28.22  "($7,520.75)"
1-Sep-10       Sep 2010 Digital Sales  Sales Credit   $79.15  "($7,548.97)"
1-Sep-10       Sep 2010 Retail Sales   Sales Credit   $78.75  "($7,628.12)"
1-Sep-10       Sep 2010 Retail Sales   Return   ($154.00)      "($7,706.87)"
1-Aug-10       Aug 2010 Digital Sales  Sales Credit   $13.09  "($7,552.87)"
1-Aug-10       Aug 2010 Retail Reserves        Retail Reserves   ($1.80)
"($7,565.96)"
1-Aug-10       Aug 2010 Retail Sales   Sales Credit   $4.50  "($7,564.16)"
1-Aug-10       Aug 2010 Retail Sales   Return   ($672.00)      "($7,568.66)"
1-Jul-10       Jul 2010 Digital Sales  Sales Credit   $32.37  "($6,896.66)"
1-Jul-10       Jul 2010 Retail Sales   Sales Credit   $582.75
"($6,929.03)"
1-Jul-10       Jul 2010 Retail Sales   Return   ($14.00)       "($7,511.78)"
1-Jun-10       Jun 2010 Retail Sales   Sales Credit   $78.75  "($7,497.78)"
1-Jun-10       Jun 2010 Digital Sales  Sales Credit   $49.88  "($7,576.53)"
1-May-10       May 2010 Digital Sales  Sales Credit   $29.75  "($7,626.41)"
30-Apr-10      Manufacturing # 11324   Payout   "($2,139.50)"  "($7,656.16)"
12-Mar-10      Advance Recoup  "($4,166.67)"  "($5,516.66)"
11-Mar-10      Advertising Mailer      Service Fee   ($100.00)
"($1,349.99)"
11-Mar-10      TWEC Marketing   Service Fee   ($750.00)      "($1,249.99)"
11-Mar-10      Pro Plan Fee     Service Fee   ($499.99)      ($499.99)
```

EXHIBIT "D"

PLIES_sales_overview (1)

| Disbursement Date | Distributor | Type | Title | Quantity | Net Earnings |
|---|---|---|---|---|---|
| 1-Dec-10 | iTunes (US) | Track | Brand New | 1 | $0.70 |
| 1-Nov-10 | iTunes (US) | Track | Brand New | 3 | $2.10 |
| 1-Oct-10 | iTunes (US) | Track | Brand New | 3 | $2.10 |
| 1-Sep-10 | iTunes (US) | Track | Brand New | 13 | $9.10 |
| 1-Aug-10 | iTunes (US) | Track | Brand New | 1 | $0.70 |
| 1-Jul-10 | iTunes (CA) | Track | Brand New | 1 | $0.66 |
| 1-Jul-10 | iTunes (US) | Track | Brand New | 5 | $3.50 |
| 1-Jun-10 | iTunes (US) | Track | Brand New | 7 | $4.90 |
| 1-May-10 | iTunes (US) | Track | Brand New | 3 | $2.10 |
| 1-Dec-10 | iTunes (US) | Track | Chris Brown | 3 | $2.10 |
| 1-Nov-10 | iTunes (US) | Track | Chris Brown | 2 | $1.40 |
| 1-Oct-10 | iTunes (US) | Track | Chris Brown | 6 | $4.20 |
| 1-Sep-10 | iTunes (US) | Track | Chris Brown | 14 | $9.80 |
| 1-Aug-10 | iTunes (US) | Track | Chris Brown | 2 | $1.40 |
| 1-Jul-10 | iTunes (CA) | Track | Chris Brown | 1 | $0.66 |
| 1-Jul-10 | iTunes (US) | Track | Chris Brown | 5 | $3.50 |
| 1-Jun-10 | iTunes (US) | Track | Chris Brown | 8 | $5.60 |
| 1-May-10 | iTunes (ES) | Track | Chris Brown | 1 | $0.94 |
| 1-May-10 | iTunes (ES) | Track | Chris Brown | 1 | $0.94 |
| 1-May-10 | iTunes (US) | Track | Chris Brown | 3 | $2.10 |
| 1-Dec-10 | Amazon (US) | Track | Fake Friends | 1 | $0.65 |
| 1-Dec-10 | iTunes (US) | Track | Fake Friends | 1 | $0.70 |
| 1-Nov-10 | iTunes (US) | Track | Fake Friends | 3 | $2.10 |
| 1-Oct-10 | iTunes (US) | Track | Fake Friends | 5 | $3.50 |
| 1-Sep-10 | iTunes (US) | Track | Fake Friends | 14 | $9.80 |
| 1-Aug-10 | iTunes (US) | Track | Fake Friends | 3 | $2.10 |
| 1-Jul-10 | iTunes (CA) | Track | Fake Friends | 1 | $0.66 |
| 1-Jul-10 | iTunes (US) | Track | Fake Friends | 5 | $3.50 |
| 1-Jun-10 | iTunes (US) | Track | Fake Friends | 10 | $7.00 |
| 1-May-10 | iTunes (ES) | Track | Fake Friends | 1 | $0.94 |
| 1-May-10 | iTunes (ES) | Track | Fake Friends | 1 | $0.94 |
| 1-May-10 | iTunes (US) | Track | Fake Friends | 4 | $2.80 |
| 1-Dec-10 | iTunes (US) | Track | Hold Ya Breath | 1 | $0.70 |
| 1-Nov-10 | iTunes (US) | Track | Hold Ya Breath | 2 | $1.40 |
| 1-Oct-10 | iTunes (US) | Track | Hold Ya Breath | 4 | $2.80 |
| 1-Sep-10 | iTunes (US) | Track | Hold Ya Breath | 14 | $9.80 |
| 1-Aug-10 | iTunes (US) | Track | Hold Ya Breath | 1 | $0.70 |
| 1-Jul-10 | iTunes (CA) | Track | Hold Ya Breath | 1 | $0.66 |
| 1-Jul-10 | iTunes (US) | Track | Hold Ya Breath | 4 | $2.80 |
| 1-Jun-10 | iTunes (US) | Track | Hold Ya Breath | 7 | $4.90 |
| 1-May-10 | iTunes (US) | Track | Hold Ya Breath | 4 | $2.80 |
| 1-Dec-10 | iTunes (US) | Track | Lifetime | 4 | $2.80 |
| 1-Nov-10 | iTunes (US) | Track | Lifetime | 4 | $2.80 |
| 1-Oct-10 | iTunes (US) | Track | Lifetime | 3 | $2.10 |
| 1-Sep-10 | iTunes (US) | Track | Lifetime | 14 | $9.80 |
| 1-Aug-10 | iTunes (US) | Track | Lifetime | 4 | $2.80 |
| 1-Jul-10 | iTunes (CA) | Track | Lifetime | 1 | $0.66 |
| 1-Jul-10 | iTunes (US) | Track | Lifetime | 6 | $4.20 |
| 1-Jun-10 | iTunes (US) | Track | Lifetime | 11 | $7.70 |
| 1-May-10 | iTunes (US) | Track | Lifetime | 7 | $4.90 |
| 1-May-10 | Amazon (US) | Track | Lifetime | 1 | $0.65 |
| 1-Jan-11 | TWEC (US) | CD | Lost Sessions | 18 | $126.00 |
| 1-Dec-10 | TWEC (US) | CD | Lost Sessions | 22 | $154.00 |
| 1-Dec-10 | iTunes (ES) | Album | Lost Sessions | 1 | $7.13 |
| 1-Dec-10 | Best Buy (US) | CD | Lost Sessions | 6 | ($42.00) |
| 1-Nov-10 | Amazon (US) | Album | Lost Sessions | 2 | $12.36 |
| 1-Nov-10 | Best Buy (US) | CD | Lost Sessions | 4 | ($28.00) |
| 1-Nov-10 | "SJ Distribution, LLC (US)" | CD | Lost Sessions | 15 | ($105.00) |
| 1-Oct-10 | Amazon (US) | Album | Lost Sessions | 1 | $6.18 |
| 1-Sep-10 | Amazon (US) | Album | Lost Sessions | 1 | $6.18 |
| 1-Sep-10 | "SJ Distribution, LLC (US)" | CD | Lost Sessions | 2 | |

Page 1

PLIES_sales_overview (1)

($14.00)

| Date | Retailer | Format | Title | Qty | Amount |
|---|---|---|---|---|---|
| 1-Sep-10 | Best Buy (US) | CD | Lost Sessions | 20 | ($140.00) |
| 1-Sep-10 | "Liaison Records, Inc (US)" | CD | Lost Sessions | 15 | $105.00 |
| 1-Aug-10 | "SJ Distribution, LLC (US)" | CD | Lost Sessions | 6 | ($42.00) |
| 1-Aug-10 | Best Buy (US) | CD | Lost Sessions | 90 | ($630.00) |
| 1-Aug-10 | FNAC (FR) | CD | Lost Sessions | 1 | $6.00 |
| 1-Jul-10 | "SJ Distribution, LLC (US)" | CD | Lost Sessions | 90 | $630.00 |
| 1-Jul-10 | "Liaison Records, Inc (US)" | CD | Lost Sessions | 2 | ($14.00) |
| 1-Jul-10 | Angelo's (US) | CD | Lost Sessions | 6 | $42.00 |
| 1-Jul-10 | "Liaison Records, Inc (US)" | CD | Lost Sessions | 15 | $105.00 |
| 1-Jun-10 | "Liaison Records, Inc (US)" | CD | Lost Sessions | 15 | $105.00 |
| 1-Dec-10 | iTunes (US) | Track | Push Whips | 3 | $2.10 |
| 1-Nov-10 | iTunes (US) | Track | Push Whips | 3 | $2.10 |
| 1-Oct-10 | Amazon (US) | Track | Push Whips | 1 | $0.65 |
| 1-Oct-10 | iTunes (US) | Track | Push Whips | 5 | $3.50 |
| 1-Sep-10 | iTunes (US) | Track | Push Whips | 14 | $9.80 |
| 1-Sep-10 | Amazon (US) | Track | Push Whips | 1 | $0.65 |
| 1-Aug-10 | iTunes (US) | Track | Push Whips | 3 | $2.10 |
| 1-Jul-10 | iTunes (CA) | Track | Push Whips | 1 | $0.66 |
| 1-Jul-10 | iTunes (US) | Track | Push Whips | 5 | $3.50 |
| 1-Jun-10 | iTunes (US) | Track | Push Whips | 12 | $8.40 |
| 1-May-10 | iTunes (US) | Track | Push Whips | 3 | $2.10 |
| 1-May-10 | iTunes (AU) | Track | Push Whips | 1 | $0.92 |
| 1-Dec-10 | iTunes (US) | Track | School Girl | 1 | $0.70 |
| 1-Nov-10 | iTunes (US) | Track | School Girl | 2 | $1.40 |
| 1-Oct-10 | iTunes (US) | Track | School Girl | 4 | $2.80 |
| 1-Sep-10 | iTunes (US) | Track | School Girl | 15 | $10.50 |
| 1-Aug-10 | iTunes (US) | Track | School Girl | 1 | $0.70 |
| 1-Jul-10 | iTunes (JP) | Track | School Girl | 1 | $1.01 |
| 1-Jul-10 | iTunes (CA) | Track | School Girl | 1 | $0.66 |
| 1-Jul-10 | iTunes (US) | Track | School Girl | 4 | $2.80 |
| 1-Jun-10 | iTunes (US) | Track | School Girl | 10 | $7.00 |
| 1-May-10 | iTunes (US) | Track | School Girl | 4 | $2.80 |
| 1-Dec-10 | iTunes (US) | Track | Time To Ride | 3 | $2.10 |
| 1-Nov-10 | iTunes (US) | Track | Time To Ride | 3 | $2.10 |
| 1-Oct-10 | iTunes (US) | Track | Time To Ride | 3 | $2.10 |
| 1-Sep-10 | iTunes (US) | Track | Time To Ride | 15 | $10.50 |
| 1-Aug-10 | iTunes (US) | Track | Time To Ride | 1 | $0.70 |
| 1-Jul-10 | iTunes (CA) | Track | Time To Ride | 1 | $0.66 |
| 1-Jul-10 | iTunes (US) | Track | Time To Ride | 4 | $2.80 |
| 1-Jul-10 | Amazon (US) | Track | Time To Ride | 1 | $0.65 |
| 1-Jun-10 | iTunes (US) | Track | Time To Ride | 7 | $4.90 |
| 1-May-10 | iTunes (ES) | Track | Time To Ride | 1 | $0.94 |
| 1-May-10 | iTunes (US) | Track | Time To Ride | 2 | $1.40 |
| 1-May-10 | iTunes (ES) | Track | Time To Ride | 1 | $0.94 |
| 1-Jan-11 | Amazon (US) | Track | Tube Top | 1 | $0.65 |
| 1-Dec-10 | iTunes (US) | Track | Tube Top | 2 | $1.40 |
| 1-Nov-10 | iTunes (US) | Track | Tube Top | 3 | $2.10 |
| 1-Oct-10 | iTunes (US) | Track | Tube Top | 4 | $2.80 |
| 1-Sep-10 | iTunes (US) | Track | Tube Top | 13 | $9.10 |
| 1-Aug-10 | iTunes (US) | Track | Tube Top | 1 | $0.70 |
| 1-Jul-10 | iTunes (CA) | Track | Tube Top | 1 | $0.66 |
| 1-Jul-10 | iTunes (US) | Track | Tube Top | 4 | $2.80 |
| 1-Jun-10 | iTunes (US) | Track | Tube Top | 8 | $5.60 |
| 1-May-10 | iTunes (ES) | Track | Tube Top | 1 | $0.94 |
| 1-May-10 | iTunes (US) | Track | Tube Top | 2 | $1.40 |
| 1-May-10 | iTunes (ES) | Track | Tube Top | 1 | $0.94 |

```
                          PLIES_sales_overview (1)
1-Dec-10        iTunes (US)    Track   What Can You Do 2      $1.40
1-Nov-10        iTunes (US)    Track   What Can You Do 4      $2.80
1-Oct-10        iTunes (US)    Track   What Can You Do 7      $4.90
1-Sep-10        iTunes (US)    Track   What Can You Do 15     $10.50
1-Aug-10        Amazon (US)    Track   What Can You Do 1      $0.65
1-Aug-10        iTunes (US)    Track   What Can You Do 7      $4.90
1-Jul-10        Amazon (US)    Track   What Can You Do 2      $1.30
1-Jul-10        iTunes (CA)    Track   What Can You Do 1      $0.66
1-Jul-10        iTunes (US)    Track   What Can You Do 6      $4.20
1-Jun-10        iTunes (US)    Track   What Can You Do 15     $10.50
1-May-10        iTunes (ES)    Track   What Can You Do 1      $0.94
1-May-10        iTunes (ES)    Track   What Can You Do 1      $0.94
1-May-10        iTunes (US)    Track   What Can You Do 9      $6.30
1-May-10        iTunes (US)    Ringtone                2      $2.00
                          $625.73
```